[Cite as *Continental Ents., Ltd. v. Franklin*, 2016-Ohio-3055.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

---

JOURNAL ENTRY AND OPINION
**No. 102899**

---

# CONTINENTAL ENTERPRISES, LTD.

PLAINTIFF-APPELLANT

vs.

# MYRON FRANKLIN, ET AL.

DEFENDANTS-APPELLEES

---

## JUDGMENT:
AFFIRMED

---

Civil Appeal from the
Shaker Heights Municipal Court
Case No.13-CVG-01306

**BEFORE:** Laster Mays, J., Keough, P.J., and E.T. Gallagher, J.

**RELEASED AND JOURNALIZED:** May 19, 2016

-i-

**ATTORNEY FOR APPELLANT**

Ted S. Friedman
32901 Station Street, Suite 105
Solon, Ohio 44139


**ATTORNEYS FOR APPELLEES**

Gary Cook
3800 Lakeside Avenue, Suite 400
Cleveland, Ohio 44114

Michael Aten
17529 Madison Avenue, Suite 211
Lakewood, Ohio 44107

ANITA LASTER MAYS, J.:

{¶1}     Plaintiff-appellant Continental Enterprises, Ltd. ("Continental"), appeals the trial court's finding for defendants-appellees Myron Franklin ("Myron") and Tracy Cloud Franklin ("Tracy") (collectively the "Franklins"), determining that Continental's retaliatory conduct served to terminate the residential lease between the parties. The trial court also dismissed Continental's counterclaims, ordered that the clerk of courts release the funds that the Franklins placed in rent escrow to Continental, and granted a judgment to Continental in the amount of $220.

{¶2}     Continental provides a single assignment of error, that the trial court erred in concluding that Continental engaged in retaliatory conduct as prohibited by R.C. 5321.02.   We disagree and affirm the trial court's decision.

## I.     BACKGROUND AND FACTS

{¶3}   Alan Pearlman ("Pearlman") is the property manager and sole owner of the Continental apartments complex.   The Franklins' leased an apartment ("Unit") for a one-year term beginning October 1, 2012, and ending September 30, 2013.   The lease contained a provision that automatically renewed for an additional year if the tenants failed to provide written notice at the designated post office box address at least 60 days prior to the expiration date.   Interaction between the parties was primarily by email.

{¶4} On October 24, 2013, Pearlman emailed the Franklins asking that they call him regarding installation of washers and dryers in the apartment units, followed by an October 25, 2013 email stating that a workman would enter their Unit to determine where the water line holes would be drilled and an October 26, 2013 notification that Continental would enter the Unit on October 28, 29, and/or 30, 2013, to drill holes in the floor and ceiling of one of the guest bedroom closet areas. The Franklins responded the morning of October 28, 2013, that they had been out of the country, had just received the email and would clear out the closet later that day so the contractors could enter the next day or one day the following week. Pearlman emailed later that afternoon that Continental had entered the Unit and the work had been performed.

{¶5} In an October 29, 2013 email to Pearlman, the Franklins expressed their dismay that the contractors entered the apartment in spite of their objection, and left dust on the furniture and surroundings and otherwise left the area in disarray. The Franklins also stated that they had previously expressed their dissatisfaction with apartment maintenance issues, requested that Pearlman provide an estimated completion date for the project, and took issue with the lack of proper notice for access to the Unit. Pearlman did not respond.

{¶6} On October 30, 2013, the Franklins emailed the City of Shaker Heights Housing Department ("City") complaining that: (1) Continental entered the Unit without proper scheduling and failed to clean up debris, leaving the living space unusable until final project completion, a projected date for which Continental refused to provide; (2)

rust had been leaking from the building roof onto their vehicles that were parked in their assigned spaces in the parking garage, and Continental refused to reassign their parking to a non-leaking area; and (3) Continental's lack of responsiveness in making repairs. On the second point, the Franklins identified a problem with moisture entering the brick exterior of the building, causing discoloration to the Unit walls that the maintenance man stated required tuck-pointing and mortar, but no efforts to repair had been made. The next day, the Franklins asked the City whether they could place their rent in escrow pending completion of the repairs.

{¶7} The City inspected the premises and issued code violation notices on November 4, 18, and December 9, 2013. On November 14, 2013, Pearlman provided email notification to the Franklins that a painter would enter their Unit at 8:00 a.m. the next morning to:

> make the minor repair to your living room wall as a result of your calling to complain to the City of Shaker Heights Housing Department. You will need to move your possessions out of the way before my painters arrive. I have reviewed your recent emails and neither of you ever mentioned any water damage to your living room wall. I guess I am supposed to be a mind reader when it comes to making repairs in your apartment. You must be disappointed when the inspector found only one item that needed to be repaired.

{¶8} A series of emails were exchanged the next day with the Franklins objecting to the short notice and Pearlman stating that his employee, "James" would see them at "4:26:01 P.M." Pearlman further informed them that a carpenter would enter their Unit within the next day or two, on Saturday or Sunday, to frame the closet and directed that they move their possessions out of the way. The Franklins replied that they had guests

using the guest room that weekend but that work could begin that Monday. They also copied the City and reminded Pearlman that his actions were "moving towards harassment."

{¶9} Pearlman replied that the work would be performed anyway and thanked the Franklins for the Ohio Landlord Tenant Law advice. The same day, Pearlman notified the Franklins that contractors would be working in several units, including the Franklins, the next week from Monday through Friday between 8:00 a.m. and 5:00 p.m. as needed. The morning of Saturday, November 16, 2013, Pearlman advised the Franklins that the carpenter had to go out of town so carpentry work would begin on Sunday.

{¶10} Pearlman subsequently admonished the Franklins for allegedly preventing his workers from entering their Unit during the weekend of November 16, 2013. They were informed that their Unit would be completed "whenever it gets done," and warned that, if they prevented entry again, the police would be summoned to enforce access.

{¶11} The Franklins advised Pearlman on November 18, 2013, that the Unit was available to access that week, including Saturday if needed. They reiterated their request for an estimated date of completion. A copy was directed to the City. On November 23, 2013, Pearlman emailed that contractors would enter their Unit, as needed, on Monday, Tuesday, and Wednesday to install water and drain lines. The Franklins thanked him for the notice and informed Pearlman that they would be entertaining their family from November 27, 2013, through Monday, December 2, 2013, for the Thanksgiving holiday and asked that Pearlman honor their observation of Sundays as a religious holiday. They

stated that anytime after December 2, 2013, with proper notification, access would not be a problem.

**{¶12}** Pearlman responded that access was required on December 2 as well as through December 6, 2013, as needed, from 8:00 a.m. to 5:00 p.m. and warned the Franklins that a refusal to grant access would result in Pearlman's calling the police to force access. On December 3, 2013, Pearlman emailed that in light of the Franklins' denial of access on December 2, 2013, the contractors would leave the water and drain lines exposed if the Franklins continued to "play games." The Franklins denied Pearlman's assertion.

**{¶13}** Also, on December 3, 2013, Pearlman emailed the Franklins and several other tenants that they had failed to pay December 2013 rent and that their rent was to be placed in the rental office door mail slot per the lease requirements. The Franklins responded that their rent check had been placed in a sealed envelope, accompanied by a notice to Pearlman, and placed in the payment slot on November 30, 2013.

**{¶14}** The notice referenced in the email was a November 30, 2013 letter addressed to Pearlman entitled "notice to correct conditions." The notice advised that the Unit had been rendered unsafe and uninhabitable due to the unfinished washer and dryer installation project instituted on October 28, 2013. It further advised that failure to resolve the issues within a reasonable amount of time "may result" in rent escrow with the court. Pearlman replied that he had not received the envelope and suggested that the Franklins issue a replacement check.

**{¶15}**     Pearlman refused the Franklins offer to meet with Pearlman to provide the replacement check and obtain a receipt, and advised them that they now owed a $30 late fee.   On December 6, 2012, Pearlman emailed the Franklins that he had just discovered the deposited envelope because it was under the shelving in the office:

> The envelope was pushed into the mail slot with extra force causing it not to drop into the collection box. Your check will be deposited today.   As far as your letter is concerned, your apartment is not uninhabitable. You have prevented us from entering your apartment on at least 5 occasions.   Your threat to escrow your monthly rent payment does not bother me as the legal process will work both ways.

**{¶16}**     The Franklins informed him that a stop payment had been put on the check based on Pearlman's suggestion and allegation that the check had not been received and, in light of his refusal to meet and issue a receipt, the replacement check was sent to the post office box stated in the lease.   Pearlman admonished that they were not to send a check to the post office box and stated they should contact their bank to rescind the stop payment on the initial check or they would also owe a returned check fee.   He further admonished that they were not supposed to send any payments to the post office box address, and said:

> Let me make this as simple as possible for you.   If I do not receive an official bank check by noon tomorrow for $1,315.00 (includes $30.00 late fee and $30.00 returned check fee).   I will instruct my attorney to file a lawsuit against you.   Thank you.

**{¶17}**   The installation project was not yet complete and, on December 7, 2013, Pearlman advised the Franklins that contractors would enter the Unit to work on the washer and dryer installation from December 9 through 13, 2013. The installation would

subsequently be inspected and, upon approval, followed by closing of the guest bedroom wall and opening the wall in the hallway.

{¶18} Pearlman filed a complaint against the Franklins on December 16, 2013, in the Shaker Heights Municipal Court on December 16, 2013 for "failure to pay December 2012 rent of $1,255.00 plus late fee at $30.00 plus returned check fee of 30.00. Failure to pay January 2013 rent of $1,255.00 plus late fee of $30.00." The complaint was amended on December 20, 2013, to reflect failure to pay rent and fees for December 2013 and January 2014.

{¶19} On December 31, 2013, the Franklins initiated their rent deposit with the court as stated in their prior notice. The Franklins denied the complaint allegations on January 8, 2014, and counterclaimed for breach of the covenant of quiet enjoyment, partial constructive eviction, breach of the implied warranty of habitability, violation of R.C. 2323.51 for filing a frivolous claim, libel, and retaliation under R.C. 5321.02. The Franklins vacated the Unit on January 31, 2014.

{¶20} Continental filed a third amended complaint on February 7, 2014, seeking rent through September 30, 2014, based on the renewal clause of the lease, late fees, turnover costs, and property damage. A bench trial ensued and written closing statements submitted. Copies of the email exchanges and photographs depicting the Unit during and after occupancy were also offered into evidence.

{¶21} On April 13, 2015, the trial court issued a Decision and Judgment Entry finding by a preponderance of the evidence that Continental engaged in retaliatory

conduct in violation of R.C. 5321.02. The trial court determined that the Franklins lawfully exercised their right to terminate their rental agreement so the lease did not extend through September 2014, that the apartment was in good condition at the time they vacated, and the washer and dryer installation was still incomplete so there was no entitlement to damages.

{¶22} The trial court also pointed out that there had never been a problem with the receipt of rent until December 2013, after the Franklins complained to the City, and after Pearlman actually received the notice of intent to escrow. Continental filed the complaint for the December rent and fees, as well as the January 2014 rent that was not yet due. The trial court concluded that the Franklins lawfully exercised their right to terminate the lease under R.C. 5321.07, and that Pearlman had engaged in retaliatory conduct in violation of R.C. 5321.02.

{¶23} Pearlman was awarded $220 rent for December 2013 and rent of $1,255 for January 2014. The security deposit was applied as well as the $1,255 in escrow with the court, constituting payment in full of the January 2014 rent obligation. Final judgment was awarded to Continental in the amount of $220. The remaining claims by the parties were denied.

## II. ASSIGNMENT OF ERROR

{¶24} Continental contends that the trial court erred when it concluded that Continental engaged in retaliatory conduct prohibited by R.C. 5321.02. We disagree.

## III. STANDARD OF REVIEW

**{¶25}** We apply a manifest weight standard of review when reviewing civil appeals from bench trials. *Seasons Coal v. Cleveland*, 10 Ohio St.3d 77, 461 N.E.2d 1273 (1984). The guiding presumption is that the trial court's findings were correct. This Court will not reverse its decision as against the manifest weight of the evidence except "if it is supported by some competent, credible evidence going to all the essential elements of the case." *Seasons Coal* at 80, quoting *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978), syllabus. But despite this deferential standard of review, "a finding of an error in law is a legitimate ground for reversal." *Seasons Coal* at 79. *See also N. Shore Auto Fin., Inc. v. Block*, 188 Ohio App.3d 48, 2010-Ohio-2447, 934 N.E.2d 381, ¶ 8 (8th Dist.)

## IV.    LAW AND ANALYSIS

**{¶26}**    R.C. 5321.02 provides:

(A)   Subject to section 5321.03 of the Revised Code, a landlord *may not retaliate against a tenant by increasing the tenant's rent, decreasing services that are due to the tenant, or bringing or threatening to bring an action for possession of the tenant's premises* because:

(1)   The tenant has complained to an appropriate governmental agency of a violation of a building, housing, health, or safety code that is applicable to the premises, and the violation materially affects health and safety;

(2)   The tenant has complained to the landlord of any violation of section 5321.04 of the Revised Code;

(3)   The tenant joined with other tenants for the purpose of negotiating or dealing collectively with the landlord on any of the terms and conditions of a rental agreement.

(B)   If a landlord acts in violation of division (A) of this section the tenant may:

(1) Use the retaliatory action of the landlord as a defense to an action by the landlord to recover possession of the premises;

(2) Recover possession of the premises; or

(3) Terminate the rental agreement.

In addition, the tenant may recover from the landlord any actual damages together with reasonable attorneys fees.

(C) Nothing in division (A) of this section shall prohibit a landlord from increasing the rent to reflect the cost of improvements installed by the landlord in or about the premises or to reflect an increase in other costs of operation of the premises.

(Emphasis added.) R.C. 5321.02.

**{¶27}** Continental posits that the Franklins' claim of retaliation must fail because, "nowhere in the body of any of the pleadings do Defendants allege that Plaintiff increased their rent, decreased services or brought or threatened to bring an action of possession." As a result, Continental concludes that the retaliation claim fails, "due to its defective adherence to the literal terms of the statute."

**{¶28}** Continental also offers that the testimony at trial does not support an increase in rent, decrease in services, or bringing or threatening to bring an action for possession as required by R.C. 5321.02. To that end, we preface our analysis by clarifying that we presume regularity in the proceedings where, as in this case, the transcript of proceedings has not been filed on appeal. *N. Olmsted v. Rock*, 8th Dist. Cuyahoga No. 99333, 2013-Ohio-3152, ¶ 21.

**{¶29}** Continental cites no legal authority in support of their R.C. 5321.02 argument as required by App.R. 16(A)(7). We, therefore, are not required to address this assignment of error.[1] *See Thornhill v. Thornhill,* 8th Dist. Cuyahoga No. 92913, 2009-Ohio-5569, ¶ 11, citing App.R. 16(A)(7) (declining to address an assignment of error where party fails to support argument with citation to legal authority).

**{¶30}** In the interest of justice, we state that the scope of retaliatory acts encompassed by R.C. 5321.02 is not afforded the strict and narrow construction proposed by Continental. "The 1974 Landlords and Tenants Act was designed to balance the rights between landlords and tenants, not to give one party an unfair advantage over the other. *See Smith v. Wright*, 65 Ohio App.2d 101, 110, [416 N.E.2d 655 (8th Dist.1979)]." *Rice v. Reid*, 3d Dist. Crawford No. 3-91-34, 1992 Ohio App. LEXIS 2145, at *8 (Apr. 23, 1992). "[T]he outcome of each case dealing with the Act will depend upon the individual facts presented therein." *Smith* at 110.

**{¶31}** The question of retaliation has arisen in cases such as a landlord's refusal to renew a lease agreement. S*ee, e.g.*, *Indian Hills Senior Community v. Sanders*, 8th Dist. Cuyahoga No. 78780, 2001 Ohio App. LEXIS 3717, at *7 (Aug. 23, 2001), and *K&D Mgmt., L.L.C. v. Masten*, 8th Dist. Cuyahoga No. 98894, 2013-Ohio-2905. In assessing a retaliation claim, the trial court is charged with determining the motives and

---

[1] The four cases cited by Continental are offered to support their argument that the only other termination mechanism available to the Franklins was for breach of the warranty of habitability and R.C. 5321.07, information that is informative but is not determinative of the question posed on appeal.

the reasons for the landlord's actions and "temporal proximity is a substantial factor in determining such motives." (Citations omitted.) *Reid v. Plainsboro Partners, III,* 10th Dist. Franklin Nos. 09AP-442 and 09AP-456, 2010-Ohio-4373, ¶ 39.

**{¶32}** Based on our review of the record, we disagree with Continental's assertion that the facts fail to support the trial court's finding that the Franklins established retaliation pursuant to R.C. 5321.02. The Franklins' retaliation claim states that the activities complained of "collectively" constitute a violation of R.C. 5321.02. The allegations include the failure to exercise reasonable care in performing the washer dryer installation, unreasonable demands for access to the unit without notice for indefinite periods and at inconvenient times, failure to correct unsafe conditions, deprivation of use of a portion of the Unit, and frivolously filing the lawsuit in December 2013.

**{¶33}** Further to the R.C. 5321.02 elements of a change in rent or services, the Franklins were deprived of the full use of their guest room, and the removal of a closet, from late October 2013 forward and, as the trial court stated, the installation was incomplete by the end of December 2013. In implementing its washer/dryer installation project in October 2013 Continental served notice on the Franklins of the various times that it wanted access to the unit, sometimes for consecutive days at a time between the hours of 8:00 a.m. and 5:00 p.m. The Franklins sometimes resisted the notifications because they were, for example, out of town and did not receive the notice until the

morning entry was planned, or they expected guests during the holiday who would occupy the guest room where the work was being conducted.

{¶34} After the Franklins lodged a report with the City, the tone of the emails became increasingly contentious and Pearlman's attitude toward effecting a mutual accommodation for access to the Unit became more negative. As the trial court noted, Pearlman even threatened to call the police if there was an access issue, even though the email evidence reflects requests for arguably reasonable accommodation, for example, requesting that the work begin on a Monday as a religious accommodation.

{¶35} The December rent situation was unique in the history of the lease duration. Pearlman first sent an email addressed to the Franklins and several tenants claiming failure to pay rent. In spite of the Franklins insistence that an envelope containing the December rent and a note was properly deposited into the office mail slot as required by the lease on November 30, 2012, Pearlman:

> (1) declared he had not received the check and note and suggested the Franklins issue a new check and include a late fee;
>
> (2) "discovered" the envelope under a shelf on December 6, 2013, alleging that it was under the shelf because the Franklins deposited it into the payment slot with force;
>
> (3) indicated he was going to deposit the original check even though he had been informed that a stop payment had been issued per his suggestion;
>
> (4) refused to meet with the Franklins to accept the replacement check and issue a receipt;
>
> (5) penalized the Franklins with a late fee and a returned check fee for a situation that the facts demonstrate Pearlman created; and

(6) filed suit December 16, 2013 for the December rent plus a late fee and returned check fee, as well as the January 2014 rent which was not yet due.

**{¶36}** We reiterate that, in examining a landlord's reasons and motives in determining retaliation, "temporal proximity is a substantial factor in determining such motives." (Citation omitted.) *Reid* at ¶ 39. The chronology of events supports the presence of the proximity factor in this case.

**{¶37}** This court finds that the ongoing, repetitive requests for access to the Unit and the extended period of time taken to complete the construction, interfering with the Franklins' use of the Unit; Pearlman's obstreperous tone and threats to call the police to obtain access; the effective increase of rent for December 2013 to include unwarranted fees for late payment of rent and a returned check where the late receipt was caused by Pearlman's actions or inactions, culminating in filing the complaint for December rent and January 2014 rent that was not yet due and that occurred after actual receipt of the intent to rent deposit, constituted a violation of R.C. 5321.02.

**{¶38}** Appellant's assignment of error is without merit. The trial court's decision is affirmed.

It is ordered that appellees recover from appellant costs herein taxed. The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the municipal court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
ANITA LASTER MAYS, JUDGE

KATHLEEN ANN KEOUGH, P.J., and
EILEEN T. GALLAGHER, J., CONCUR