[Cite as *McGraw v. Jarvis* , 2021-Ohio-522.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Karen McGraw, Trustee of the Lenor A. Balcar Irrevocable Trust, et al., | : | |
| | : | |
| Plaintiffs-Appellants/ Cross-Appellees, | : | No. 19AP-538 (C.P.C. No. 15CV-010264) |
| v. | : | (REGULAR CALENDAR) |
| Timothy Jarvis, Esq., et al., | : | |
| Defendants-Appellees/ Cross-Appellants. | : | |
| | : | |

D E C I S I O N

Rendered on February 25, 2021

**On brief:** *The Law Office of Ryan Gordon,* and *Ryan A. Gordon*; *Paul W. Flowers Co., L.P.A., Paul W. Flowers,* and *Louis E. Grube*, for plaintiffs-appellants/cross-appellees. **Argued:** *Paul W. Flowers.*

**On brief:** *Newhouse, Prophater, Kolman & Hogan, LLC, D. Wesley Newhouse*, and *Michael S. Kolman*, for defendants-appellees/cross-appellants. **Argued:** *Michael S. Kolman.*

APPEAL from the Franklin County Court of Common Pleas

LUPER SCHUSTER, J.

{¶ 1} Plaintiffs-appellants/cross-appellees, Karen McGraw, Trustee of the Lenor A. Balcar Irrevocable Trust and the Lenor A. Balcar Irrevocable Trust ("the trust") (collectively "appellants"), appeal from (1) the final judgment entry of the Franklin County Court of Common Pleas entering judgment in favor of appellants on their claim of legal malpractice and awarding them compensatory and punitive damages; (2) a decision and entry of the Franklin County Court of Common Pleas granting the motion of defendants-

appellees/cross-appellants, Timothy Jarvis, Esq. ("Jarvis") and Jarvis Law Office, LLC ("the law firm") (collectively "appellees"), to reduce the amount of the jury's punitive damages award to zero; and (3) a decision and entry of the Franklin County Court of Common Pleas denying in part and granting in part appellants' motion for attorney fees. Appellees filed a cross-appeal from (1) a decision and entry of the Franklin County Court of Common Pleas denying their motion to dismiss for lack of subject-matter jurisdiction; and (2) from a decision and entry of the Franklin County Court of Common Pleas denying their motion for judgment notwithstanding the verdict and/or remitter concerning the verdict for punitive damages. For the following reasons, we affirm in part and reverse in part.

## I.  Facts and Procedural History

{¶ 2}  On November 17, 2015, appellants filed a complaint asserting a claim of legal malpractice against appellees. The complaint represented a refiled complaint from an action originally filed October 2, 2012, which appellants dismissed without prejudice pursuant to Civ.R. 41 on November 17, 2015 before refiling the instant action. The complaint alleged appellees, who practice in the area of elder law, drafted documents to create the trust in August 2010 as part of their representation of Lenor Balcar and Frank Balcar but failed to adequately fund the trust. Appellants alleged appellees fell below the standard of care in (1) failing to determine whether Frank Balcar was competent to sign his last will and testament; (2) notarizing Frank Balcar's signature on the will without actually witnessing it; (3) failing to properly fund the trust; (4) failing to advise the trustee that the trust was not funded; (5) failing to provide Lenor Balcar's children with trust documents after her death, leading to the filing of a lawsuit in Belmont County; (6) failing to timely deliver the legal file to the trustee and her attorneys; and (7) failing to cooperate with discovery in the Belmont County litigation.

{¶ 3}  Appellees filed an answer responding to appellants' refiled complaint on December 9, 2015 asserting for the first time that appellants were not a real party in interest. The trial court then entered an agreed order on February 24, 2016 permitting the use of discovery from the dismissed case in the refiled action.

{¶ 4}  Subsequently, on April 16, 2018, appellees filed a motion to dismiss arguing appellants lacked standing and the trial court thus lacked subject-matter jurisdiction to hear the case. Specifically, appellees argued appellants, as captioned on the complaint,

were not the real parties in interest because the trust, as named on the complaint, did not exist. Appellees asserted the proper party would have been the Balcar Family Irrevocable Trust but because appellants never even mentioned the proper name of the trust in any of the filings for the dismissed case or in any of the filings in the current case, appellants therefore never commenced an action within the meaning of R.C. 2305.17. Appellees further argued the trial court lacked subject-matter jurisdiction because, even if appellants attempted to substitute the correct party, the amendment would date back only to the commencement of the current litigation, not the complaint filed initially and subsequently dismissed, and, thus, the statute of limitations would have run. The trial court denied appellees' motion to dismiss in a May 11, 2018 decision and entry finding the reference to the name of the trust in the case caption was akin to a clerical error rather than a substitution of a party. The trial court granted leave to appellants to file an amended complaint correcting the misnomer in the party names, and appellants filed such an amended complaint on September 25, 2018 identifying the trust as the Balcar Family Irrevocable Trust.

{¶ 5} As appellants sought both compensatory and punitive damages, the matter proceeded to a bifurcated jury trial beginning March 11, 2019. During the trial, Karen testified that her parents, Frank and Lenor Balcar, were married for 69 years and had 5 children. Barbara Balcar, Karen's sister, testified that their parents lived most of their lives in Ohio except for several years they spent in Florida. While Frank and Lenor lived in Florida, Lenor created the Lenor W. Balcar Revocable Living Trust ("Lenor's revocable trust"), of which Frank was the primary beneficiary. The Balcars transferred their Florida and Ohio residences into Lenor's revocable trust along with most of Lenor's personal belongings.

{¶ 6} In 2009, Lenor and Frank sold their Florida residence and moved back to Ohio. In the spring of 2010, Frank suffered a stroke and moved into an assisted living facility. While Frank was in the assisted living facility, Lenor and Karen contacted Jarvis to inquire about possible ways to save on the out-of-pocket costs of the assisted living facility. Karen and Lenor provided Jarvis with a copy of Lenor's revocable trust and documentation of Frank and Lenor's assets, and Jarvis then met with Karen and Lenor in May 2010.

During the meeting, Karen said Jarvis estimated he could help Lenor save between $95,000 and $110,000 on the cost of Frank's care at the assisted living facility.

{¶ 7}    Jarvis proposed creating an irrevocable trust with Karen and Lenor as co-trustees, and Karen testified that Jarvis agreed to "fund the trust," specifically stating he would put the house and all of Frank's assets into the trust. (Mar. 12, 2019 Tr. Vol. II at 221.)  Additionally, Karen testified that Jarvis offered to "interact with any of the siblings if he needed to," stating he would write letters to the siblings after Lenor's passing to inform them of the creation of the trust and how it would impact them.  (Tr. Vol. II at 221.)  Karen testified that Jarvis assured both Karen and Lenor that the other children of Lenor and Frank's marriage "would never see the trust," noting that Lenor's privacy was an important consideration.  (Tr. Vol. II at 243.)  It was determined that Karen would serve as the trustee. Frank did not attend this initial meeting.

{¶ 8}    In June 2010, the Balcars formally engaged Jarvis for the purpose of estate and Medicaid planning.  Jarvis never prepared a written attorney-client agreement, but he verbally informed the Balcars of his fee.  Appellees then created the following instruments as part of the Balcars' estate plan: (1) the Balcar Family Irrevocable Trust, dated August 12, 2010; (2) a pour-over will for Frank, dated August 12, 2010; (3) a general durable power of attorney for Frank, executed June 25, 2010; (4) a second general durable power of attorney for Frank, executed June 28, 2010; (5) a pour-over will for Lenor, executed August 12, 2010; and (6) a valid durable general power of attorney for Lenor, executed August 12, 2010. Among numerous alleged mistakes in these instruments, Jarvis notarized Frank's June 25 power of attorney without being present for its signing.  Additionally, Jarvis admitted that Frank did not sign either his will or the Balcar Family Irrevocable trust in Jarvis' presence, but Jarvis nonetheless notarized those instruments.

{¶ 9}    Jarvis' plan was to help Frank become eligible for Medicaid after a 15-month penalty period, though Jarvis was aware that at the time of the creation of the estate planning documents, Frank was 95 years old, had dementia, and was largely incapacitated following his stroke.  Jarvis agreed that Frank would not see any savings until several months after turning 96.  However, Frank died on November 6, 2010, less than 3 months after executing the Balcar Family Irrevocable Trust.  When Frank died, numerous assets

had not yet been transferred into the trust, leaving Frank an estate worth $738,000 that ultimately was subject to probate costs and estate taxes.

{¶ 10} Several months later, on May 13, 2011, Lenor passed away, and Karen called appellees to inform them of Lenor's death. Karen testified she had to contact appellees several more times over the course of one month before appellees drafted the anticipated letter to Karen's siblings regarding her parents' estate plans. Karen said the draft of the letter stated Jarvis represented Lenor's estate but made no mention of representing Frank's estate. Additionally, the draft of the letter informed the siblings that Karen had been appointed the trustee of "mother's trust" and had been advised to change the locks on the family home, directing the siblings to address any questions to Jarvis' law office. (Tr. Vol. II at 388.) Karen testified that several more months passed and appellees still had not sent the letter to her siblings.

{¶ 11} Two of Karen's siblings, Paul and Bruce, sent numerous requests to Karen and Jarvis requesting copies of the Balcar Family Irrevocable Trust. Karen asked Jarvis for advice on how to respond to her brothers, but Jarvis never provided Karen with a response on how she should respond, instead sending Karen an email stating the letter was not yet completed and accusing Karen of being a difficult client.

{¶ 12} In October 2011, Jarvis informed Karen she was legally obligated to provide a copy of the trust to her siblings. Jarvis also withdrew as counsel for the estate, telling Karen he believed litigation seemed likely and that he thought he would be called as a witness since he drafted the trust. Karen testified she was shocked by these events as Jarvis had led her to believe she would not ever have to provide the trust to her siblings. On October 5, 2011, Karen directed Jarvis to send her client information to a new attorney she had hired as his replacement. However, Karen testified Jarvis still did not release the client file to her new attorney in the following months.

{¶ 13} Eventually, Karen's brother Paul filed a complaint against Karen in the Belmont County Probate Court, alleging Karen had failed to respond to any requests for information about the irrevocable trust and failed to provide the siblings with a copy of the irrevocable trust within a reasonable time. After months of litigation, in October 2012, the Belmont County Probate Court ordered Jarvis to appear for deposition with the client file. Jarvis attempted to resist the order for deposition but was unsuccessful. The Belmont

County Probate Court issued a November 5, 2012 judgment entry detailing Jarvis' ongoing refusal since January 2012 to comply with the request for the client file, to honor a valid subpoena, to appear for a deposition, and to attend a scheduled court hearing.

{¶ 14} Ultimately, the Balcar siblings entered into a voluntary settlement agreement in August 2013. The Belmont County Probate litigation resulted in an order preventing the sale of the Balcars' house, resulting in the trust incurring approximately $55,000 in property taxes, home insurance, and maintenance costs. Additionally, the trust spent $54,500 on the administration of Frank's probate estate and $5,790 in mediation fees, while Karen incurred $10,000 in travel expenses on her repeated trips from her home in South Carolina to Ohio to handle her parents' estate and the ensuing litigation. The settlement did not end the matter; the Belmont County litigation was still pending at the time of trial.

{¶ 15} In the trial in the instant matter, appellants also presented expert testimony from Janet Lowder, an attorney practicing in the field of elder law, who opined that appellees had breached their duty of care to appellants. Specifically, Lowder testified Jarvis was deficient in failing to define the scope of the work he was going to do, for leading the clients to believe he would fund the trust and that he would open and manage Frank's probate estate, for failing to refer the clients to another attorney, for failing to respond to repeated attempts at communication from Karen, for waiting 13 months to provide a copy of the client file to the new attorney, for witnessing legal instruments when he was not in the presence of the affiant, and in failing to properly advise Karen of her duties in her role as trustee. Lowder additionally testified it was her opinion that Jarvis' breach of his duties proximately caused damages to appellants in leading to the Belmont County probate litigation and the ensuing family conflict.

{¶ 16} Appellees presented their own expert testimony from Douglas Wrightsel, opining that even if Jarvis' representation may have breached the standard of care, he did not believe any breach proximately caused any damages to the trust. Wrightsel characterized much of Jarvis' behavior after he withdrew as counsel for the trust as akin to a discovery dispute.

{¶ 17} At the close of appellants' case, appellees moved for directed verdict on multiple grounds. As relevant here, the trial court denied appellees' motion for directed

verdict with respect to damages related to the need to open the probate estate but granted appellees' motion for directed verdict with respect to the attorney fees associated with the Belmont County Probate Court litigation. Following deliberations, the jury returned a verdict in favor of appellants, finding appellees liable for legal malpractice and awarding $150,000 in compensatory damages.

{¶ 18} The trial then moved into the second phase of the bifurcated trial to address appellants' claim for punitive damages. Appellants argued the evidence presented during the liability phase also showed that appellees acted with malice, thus entitling them to recovery of punitive damages. Following appellants' argument, appellees moved for directed verdict, arguing there was insufficient evidence of appellees' financial situation. The trial court denied appellees' motion for directed verdict, stating it was not aware of any case law requiring appellants to put on evidence of appellees net worth or ability to pay punitive damages. Jarvis then testified regarding his net worth during the relevant time period, stating his net worth "would have been negative" at that time due to student loans, child support, and spousal support payments. (Mar. 21, 2019 Tr. Vol. IX at 2073.) The jury awarded appellants $200,000 in punitive damages.

{¶ 19} Following the trial and jury verdict, the trial court denied appellees' motion for judgment notwithstanding the verdict concerning the jury's punitive damages verdict. However, the trial court granted appellees' motion concerning entering judgment related to the jury's punitive damages verdict, ordering that, pursuant to R.C. 2315.21(D)(2)(b), the jury's punitive damages verdict must be reduced to $0.00. Additionally, the trial court granted in part and denied in part appellants' motion to tax litigation expenses as costs and granted in part and denied in part appellants' motion for attorney fees, awarding appellants $111.00 in costs and $129,353.44 in attorney fees. On August 20, 2019, the trial court issued a final judgment entry against appellees in the amount of $279,353.44. Appellants timely appeal, and appellees timely cross-appeal.

## II. Assignments of Error

{¶ 20} Plaintiffs-appellants/cross-appellees assign the following errors for our review:

> [1.] By entering a directed verdict upon the potentially meritorious claim for damages for legal fees and expenses

unnecessarily incurred in the Belmont County probate proceedings, the trial court erred as a matter of law to plaintiff-appellant's detriment.

[2.] The trial court erred as a matter of law, and otherwise committed an abuse of discretion, by eliminating the jury's award of punitive damages under R.C. 2315.21(D)(2)(b) on the grounds that defendant-appellees had absolutely no net worth during the relevant period.

[3.] The jury's determination that plaintiff-appellant should be made whole through an award of attorney fees and litigation expenses was thwarted, to the trust's substantial detriment, when the trial court failed to award the entire amounts reasonably and necessarily incurred during the protracted litigation.

{¶ 21} Defendants-appellees/cross-appellants assign the following errors for our review:

[1.] The trial court erred in failing to dismiss this action because the original named plaintiffs were not the real parties in interest; the court lacked subject matter jurisdiction.

[2.] The trial court erred when it denied defendants' motion for directed verdict and for judgment notwithstanding the verdict/new trial on plaintiffs' claim for punitive damages because there was insufficient evidence to support the essential elements of this claim, which, in turn warrants vacating the award for attorneys fees.

For ease of discussion, we address the assignments of error out of order.

### III.  Appellees' First Assignment of Error – Motion to Dismiss

{¶ 22} In their first assignment of error, appellees argue the trial court erred in denying their motion to dismiss the action.  More particularly, appellees assert the trial court lacked subject-matter jurisdiction over the case because appellants initially misidentified themselves in both the dismissed complaint and the current litigation.[1]

---

[1] The complaint filed on November 17, 2015 identified the plaintiffs as (1) Karen McGraw, Trustee of the Lenor A. Balcar Irrevocable Trust, and (2) The Lenor A. Balcar Irrevocable Trust. Because the wrong name is used for the trust both in its individual designation and in the reference to Karen's status as trustee, the misidentification and subsequent need for correction of the party names applied to both of the appellants.

**{¶ 23}** Civ.R. 12(B)(1) permits dismissal where the trial court lacks jurisdiction over the subject matter of the litigation. *Guillory v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No 07AP-861, 2008-Ohio-2299, ¶ 6. Subject-matter jurisdiction involves a court's power to hear and decide a case on the merits. *Lowery v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 14AP-730, 2015-Ohio-869, ¶ 6, citing *Vedder v. Warrensville Hts.*, 8th Dist. No. 81005, 2002-Ohio-5567, ¶ 14. In deciding a Civ.R. 12(B)(1) motion, a court must dismiss for lack of subject-matter jurisdiction if the complaint fails to allege any cause of action cognizable in the forum. *Brown v. Levin*, 10th Dist. No. 11AP-349, 2012-Ohio-5768, ¶ 14. An appellate court reviews a trial court's decision on a Civ.R. 12(B)(1) motion to dismiss for lack of subject-matter jurisdiction under a de novo standard of review. *Pankey v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 13AP-701, 2014-Ohio-2907, ¶ 7.

**{¶ 24}** Appellees argue the trial court erred in denying their motion to dismiss because appellants, as named in the complaint, were not the real party in interest. As the Supreme Court of Ohio has explained, the concept of subject-matter jurisdiction is distinct from the concept of a real party in interest, the latter of which implicates standing as opposed to subject-matter jurisdiction. *State ex rel. Jones v. Suster*, 84 Ohio St.3d 70, 77 (1998) (noting "[a]lthough a court may have subject matter jurisdiction over an action, if a claim is asserted by one who is not the real party in interest, then the party lacks standing to prosecute the action," and "[l]ack of standing challenges the capacity of a party to bring an action, not the subject matter jurisdiction of the court"), citing *State ex rel. Smith v. Smith*, 75 Ohio St.3d 418, 420 (1996). Thus, despite the framing of their motion to dismiss, appellees are not challenging the subject-matter jurisdiction of the trial court but, rather, are inquiring into appellants' ability to invoke the trial court's jurisdiction over this particular case. *Greenberg v. Heyman-Silbiger*, 10th Dist. No. 16AP-283, 2017-Ohio-515, ¶ 21, citing *Bank of Am., N.A. v. Kuchta*, 141 Ohio St.3d 75, 2014-Ohio-4275, ¶ 18, 22 (distinguishing between different concepts of the term "jurisdiction"). "A lack of standing vitiates the party's ability to invoke the jurisdiction of a court, even a court of competent subject-matter jurisdiction," but "standing and capacity to sue do not challenge the subject-matter jurisdiction of the court." *Greenberg* at ¶ 21, citing *Kuchta* at ¶ 22, and *PNC Bank, Natl. Assn. v. Botts*, 10th Dist. No. 12AP-256, 2012-Ohio-5383, ¶ 22.

{¶ 25} We conclude the trial court did not err in denying appellees' Civ.R. 12(B)(1) motion to dismiss as appellants' alleged lack of standing is not a matter subject to a motion for dismissal pursuant to Civ.R. 12(B)(1). However, we will additionally address appellees' argument under this assignment of error challenging the trial court's determination that appellants had the requisite standing to maintain the action. The trial court construed the error in appellants' name as listed in the case caption as a misnomer or clerical error, and it permitted correction of the error as such. Appellees assert that even if the error was clerical in nature, the amendment to fix the party name would not relate back to the date of the original complaint, and thus appellants cannot rely on the savings statute to bring their refiled action within the applicable statute of limitations. Appellees argument, therefore, involves the interplay between the savings statute and the relation back provisions of Civ.R. 15(C).

{¶ 26} Pursuant to Civ.R. 15(C):

> Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading. An amendment changing the party against whom a claim is asserted relates back if the foregoing provision is satisfied and, within the period provided by law for commencing the action against him, the party to be brought in by amendment (1) has received such notice of the institution of the action that he will not be prejudiced in maintaining his defense on the merits, and (2) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against him.

Thus, Civ.R. 15(C) allows an amendment to change the party to a lawsuit, and it further allows that amendment to relate back to the date of the original pleading. Here, however, appellants dismissed the original pleading without prejudiced pursuant to Civ.R. 41(A)(1)(a). "[W]hen a party files a voluntary dismissal pursuant to Civ.R. 41(A)(1)(a), the case ceases to exist. In effect, it is as if the case had never been filed." *Sturm v. Sturm*, 61 Ohio St.3d 298, 302 (1991), citing *Zimmie v. Zimmie*, 11 Ohio St.3d 94, 95 (1984). Thus, we agree with appellees' general proposition that an amendment to the party names would relate back only to the date of the filing of the current litigation, not of the previously

dismissed litigation. *See, e.g., Griesmer v. Allstate Ins. Co.*, 8th Dist. No. 91194, 2009-Ohio-725, ¶ 37 (holding Civ.R. 15(C) cannot be used to relate back to a complaint in another case), citing *Dietrich v. Widmar*, 8th Dist. No. 8509, 2005-Ohio-2004, ¶ 12.

{¶ 27} Because the amendment to the party names only relates back to the current litigation, not to the date of the original complaint in the dismissed litigation, appellees argue the savings statute cannot apply to bring the current litigation within the applicable one-year statute of limitations for legal malpractice actions. *See* R.C. 2305.11(A). The Ohio savings statute, R.C. 2305.19, affords a plaintiff a limited time period to refile a dismissed claim that would otherwise be time-barred. *Nye v. Univ. of Toledo*, 10th Dist. No. 12AP-670, 2013-Ohio-2311, ¶ 23. The statute provides:

> In any action that is commenced or attempted to be commenced, if in due time a judgment for the plaintiff is reversed or if the plaintiff fails otherwise than upon the merits, the plaintiff * * * may commence a new action within one year after the date of the reversal of the judgment or the plaintiff's failure otherwise than upon the merits or within the period of the original applicable statute of limitations, whichever occurs later.

R.C. 2305.19(A).

{¶ 28} "The savings statute applies when the original suit and the new action are substantially the same." *Children's Hosp. v. Ohio Dept. of Pub. Welfare*, 69 Ohio St.2d 523, 525 (1982). "The actions are not substantially the same, however, when the parties in the original action and those in the new action are different." *Id.* Appellees argue that by allowing appellants to change their name in the case caption to reflect the proper name of the trust, the refiled case therefore involves different parties than those involved in the original case. Thus, appellees assert that because the Balcar Family Irrevocable Trust never commenced an action, the savings statute cannot operate to bring the current litigation within the statute of limitations.

{¶ 29} The flaw in appellees' argument is the nature of the amendment to the party names in this case. As the trial court explained in denying appellees' motion to dismiss, the error in appellants name as originally styled in the dismissed case and as originally styled in the current case was akin to a clerical error. Appellants agree the proper name of the trust is the Balcar Family Irrevocable Trust; indeed, the trust document appellants attached to

the complaint both in the current litigation and filed as an exhibit in the dismissed action properly identified the trust as the Balcar Family Irrevocable Trust. There was never any genuine confusion among the parties as to which trust document the complaints referred. Additionally, the trial court noted the mistake was attributable to appellants' former trial counsel who has since faced disciplinary action, and appellees admitted in their answers throughout the litigation that they drafted the irrevocable trust in question. Accordingly, we agree with the trial court that the amendment to the current case, in correcting a clerical error to appellants' name in the case caption, did not operate to render the current litigation substantially different from the dismissed action. Appellants were not attempting to add a new party to the case who had never been a party; instead, they corrected the clerical error in the caption of the case. Thus, the correction of the clerical error does not render the savings statute inapplicable, and the trial court did not err in denying appellees motion to dismiss. We overrule appellees' first assignment of error.

## IV. Appellants' First Assignment of Error – Directed Verdict

{¶ 30} In their first assignment of error, appellants argue the trial court erred in granting appellees' motion for directed verdict on their claim of damages for legal fees and expenses incurred in the Belmont County probate proceedings.

{¶ 31} When a court considers a motion for a directed verdict, the court must construe the evidence most strongly in favor of the party against whom the motion is directed. Civ.R. 50(A). "A motion for a directed verdict raises questions of law, not factual issues, because it tests whether the evidence is legally sufficient to allow the case to be presented to the jury for deliberation." *Reeves v. Healy*, 192 Ohio App.3d 769, 2011-Ohio-1487, ¶ 37 (10th Dist.), citing *Texler v. D.O. Summers Cleaners & Shirt Laundry Co.*, 81 Ohio St.3d 677, 679-80 (1998). The court's disposition of the motion does not involve either weighing the evidence or the credibility of the witnesses. *Id.* at ¶ 37, citing *Texler* at 679-80. A court should grant a motion for directed verdict when, "after construing the evidence most strongly in favor of the party against whom the motion is directed, 'reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party.' " *Goodyear Tire & Rubber Co. v. Aetna Cas. & Surety Co.*, 95 Ohio St.3d 512, 2002-Ohio-2842, ¶ 3, quoting Civ.R. 50(A)(4).

{¶ 32} By contrast, the court must deny the motion if any evidence of substantial probative value favors the nonmoving party and reasonable minds might reach different conclusions on that evidence. *Reeves* at ¶ 37, citing *Texler* at 679-80; *Strother v. Hutchinson*, 67 Ohio St.2d 282, 284-85 (1981). "Because a directed verdict tests only the sufficiency of the evidence, it presents a question of law that appellate courts review de novo." *Reeves* at ¶ 37, citing *Jarupan v. Hanna*, 173 Ohio App.3d 284, 2007-Ohio-5081, ¶ 8 (10th Dist.), citing *Groob v. KeyBank*, 108 Ohio St.3d 348, 2006-Ohio-1189, ¶ 14, and *Goodyear Tire & Rubber Co.* at ¶ 4.

{¶ 33} Appellees moved for directed verdict on several grounds, including, as relevant here, on appellants' claim for compensatory damages in the form of attorney fees incurred in connection with the Belmont County litigation, arguing appellants did not present any expert testimony regarding the reasonableness of that fee, hourly rate, or necessity of work. Appellants responded that they provided lay testimony regarding the attorney fees incurred and argued the trier of fact should be able to hear those alleged damages. The trial court agreed with appellees that appellants were required to provide expert testimony on the reasonableness and necessity of the attorney fees. Thus, the trial court determined that because appellants did not disclose any expert witness, nor call one to testify, on the issue of the reasonableness and necessity of the attorney fees, it would not admit into evidence a document showing the attorney fees approved by the Belmont County Probate Court related to the administration of the probate estate. Additionally, the trial court granted appellees' motion for directed verdict on the damages related specifically to the attorney fees incurred in the Belmont County litigation. The trial court did allow the jury to consider the question of other damages stemming from the need to open the probate estate and from appellees' failure to produce the client file.

{¶ 34} " 'To establish a cause of action for legal malpractice based on negligent representation, a plaintiff must show (1) that the attorney owed a duty or obligation to the plaintiff, (2) that there was a breach of that duty or obligation and that the attorney failed to conform to the standard required by law, and (3) that there is a causal connection between the conduct complained of and the resulting damage or loss.' " *Brust v. Kravitz*, 10th Dist. No. 16AP-201, 2016-Ohio-7871, ¶ 35, quoting *Vahila v. Hall*, 77 Ohio St.3d 421 (1997), syllabus. Further, the Supreme Court of Ohio has held that, with limited exceptions,

"in a legal malpractice case, expert testimony is generally required in order to prove breach of the duty that the attorney owed to the plaintiff." *Brust* at ¶ 36, citing *McInnis v. Hyatt Legal Clinics*, 10 Ohio St.3d 112, 113 (1984); *see also Lundeen v. Graff*, 10th Dist. No. 15AP-32, 2015-Ohio-4462, ¶ 17 (noting "[e]xpert testimony is required so that the trier of fact does not have to speculate on the standard of care," a matter normally not within the realm of the understanding of the layman).

{¶ 35} Here, appellants provided expert testimony at trial on the issues of breach of duty and proximate cause. However, their liability expert witness did not provide testimony regarding specific amounts of damage, and appellants did not identify or call another expert witness to testify to the amount of damages incurred as a proximate result of appellees' legal malpractice.

{¶ 36} As noted above, a plaintiff generally is required to provide expert testimony to establish breach of the duty that the attorney owed the plaintiff. *Brust* at ¶ 36, citing *McInnis* at 113. Notably, however, Ohio courts have held that expert testimony is not required to establish proximate cause in a legal malpractice action. *Morris v. Morris*, 9th Dist. No. 21350, 2003-Ohio-3510, ¶ 21 (concluding that while an expert *may* render an opinion on the issue of proximate cause, such an expert opinion is not required as "Ohio law does not require expert witness evidence to establish proximate cause in legal malpractice actions"), citing *Montgomery v. Gooding, Huffman, Kelly & Becker*, 163 F.Supp.2d 831, 837 (N.D.Ohio 2001); *Wayside Body Shop, Inc. v. Slaton*, 2d Dist. No. 25219, 2013-Ohio-511, ¶ 30. Similarly, appellees do not identify a requirement that a plaintiff in a legal malpractice action must provide expert testimony to establish the amount of damages. *See Evans v. Moore*, 1st Dist. No. C930288, 1994 Ohio App. LEXIS 3059 (June 29, 1994) (concluding the cases imposing a requirement of expert testimony on the issue of breach of duty of care in legal malpractice cases *do not* impose a requirement that expert testimony is required on the issue of damages). Thus, while a plaintiff claiming legal malpractice must put forth evidence of damages, there is no requirement in Ohio law that those damages be supported by expert testimony.

{¶ 37} Although Ohio law does not require, specifically, that a plaintiff provide expert testimony to establish the damages prong of a claim of legal malpractice, appellees nonetheless continue to assert on appeal that expert testimony was required to prove the

specific damages sought here.  More particularly, appellees argue that since the damages sought are really the attorney fees charged in the Belmont County litigation, appellants were required to prove the reasonableness and necessity of those attorney fees using expert testimony.  In granting appellees' motion for directed verdict, the trial court determined it could not allow the jury to consider the question of compensatory damages in the form of attorney fees incurred in the Belmont County litigation without expert testimony.  On the facts of this case, we disagree with the trial court.

{¶ 38} Trial courts are frequently presented with, and must rule on, motions for attorney fees, and those courts then have the discretion to determine whether or not to award fees reasonably and necessarily incurred.  *See, e.g., Hikmet v. Turkoglu*, 10th Dist. No. 08AP-1021, 2009-Ohio-6477, ¶ 86 (noting a trial court has discretion to determine a "reasonable" award of attorney fees).  Parties may, and often do, support their requests for attorney fees with expert testimony.  However, though a court ruling on a motion for attorney fees *in the first instance* has discretion to assign weight to the evidence presented to it before rendering its decision on attorney fees, a court considering a motion for directed verdict on the amount of compensatory damages in a civil liability case engages in no such weighing of the evidence.  *Sharp v. Norfolk & W. Ry. Co.,* 72 Ohio St.3d 307, 311 (1995) ("on a motion for a directed verdict, the court does not weigh the evidence or determine the credibility of the witnesses").  Here, the question of whether appellants convincingly proved the reasonableness and necessity of the legal fees incurred in the Belmont County litigation was not the direct question before the court. Instead, the question was whether appellants presented any evidence of substantial probative value supporting their claim for compensatory damages proximately caused by appellees' breach and whether reasonable minds might reach different conclusions on that evidence.  *Reeves* at ¶ 37.  As a general rule, "in a tort action, the measure of damages is that which will compensate and make the plaintiff whole."  *Robinson v. Bates*, 112 Ohio St.3d 17, 2006-Ohio-6362, ¶ 11; *Amyx v. Penix-Kinsler*, 10th Dist. No. 14AP-1059, 2015-Ohio-3980, ¶ 10.

{¶ 39} During the trial, appellants relied on the expert testimony of Lowder, an attorney trained in elder law, to help establish their claim that appellees owed a duty to appellants and breached that duty.  Lowder testified it was her opinion that appellees fell below the standard of care, and she further testified it was her opinion that appellees'

breach of the duty was the proximate cause of the resultant damages. Lowder explained her opinion that appellees' failure to act with diligence and promptness when Karen's siblings requested copies of the trust "clearly leads to litigation or to if not litigation, certainly terrible conflict within a family." (Mar. 15, 2019 Tr. Vol. V at 1102.) Additionally, Lowder testified "[t]hese families are going through enough conflict already without [attorneys] aggravating that conflict and not responding, not doing our job or doing our job so poorly that, you know, everybody is suing one another." (Tr. Vol. V at 1102-03.) Though Lowder did not testify, specifically, regarding the dollar amount of damages appellants sought, Karen Balcar testified about the amount of fees incurred in the Belmont County litigation. Appellants additionally provided documentation of the amount of legal fees approved by the Belmont County Probate Court.

{¶ 40} Having reviewed the record, we conclude appellants presented evidence of substantial probative value on the amount of damages they incurred as a result of appellees' breach and that reasonable minds could reach different conclusions on that evidence. Karen testified that the trust incurred those fees as part of the Belmont County litigation, and she supported her testimony with documentation from the Belmont County Probate Court itemizing those fees that had been approved. It was not for the trial court, upon consideration of the motion for directed verdict, to weigh the evidence and determine whether those fees were reasonable and necessary. Instead, it was for the jury to consider both appellants' proffered evidence of the damages actually incurred and appellees arguments as to why those fees were not proximately caused by appellees' conduct before deciding whether appellants were entitled to recovery of compensatory damages and in what amount. To the extent appellees argue that appellants should not be able to recover any portion of the Belmont County litigation expenses as part of their compensatory damages on the grounds that those fees were not reasonable or necessary, whether those fees were reasonable and necessary, and thus part of those damages that would make appellants whole, are questions for the trier of fact. *See Coleman v. Kindercare Learning Ctr., Inc.,* 10th Dist. No. 99AP-259, 1999 Ohio App. LEXIS 6461 (Dec. 30, 1999) ("[r]easonableness is generally a question of fact to be resolved by the trier of fact"; reasonableness is a question of fact).

{¶ 41} Thus, because the trial court erred in concluding that expert testimony was required to demonstrate the reasonableness and necessity of attorney fees here and/or that expert testimony was required to establish the amount of damages caused as a proximate result of appellees' breach of their professional duty in the claim of legal malpractice, we conclude the trial court erred. Appellants provided evidence of the amount of fees they incurred as a result of their participation in the Belmont County litigation, and they provided additional evidence that those damages were proximately caused by appellees' breach of their professional duty. Because we conclude reasonable minds could come to different conclusions about that evidence, it was for a jury to decide whether appellees' conduct proximately caused the damages in the form of the legal fees associated with the Belmont County litigation and in what dollar amount. Our conclusion is based on the facts in this case, and we are not deciding in what other circumstances an expert witness may be required to determine an award of attorney fees. *See, e.g., In re Estate of Klie*, 10th Dist. No. 16AP-77, 2017-Ohio-487, ¶ 22 (discussing the use of expert testimony in awarding attorney fees in probate cases), citing *In re Estate of Born*, 10th Dist. No. 06AP-1119, 2007-Ohio-5006, ¶ 21, and *In re Estate of Haller*, 116 Ohio App.3d 866, 870 (10th Dist.1996); *Long v. Long*, 10th Dist. No. 11AP-510, 2012-Ohio-6254, ¶ 20 (discussing the use of expert testimony regarding the reasonableness of attorney fees in divorce proceedings), citing *McCord v. McCord*, 10th Dist. No. 06AP-102, 2007-Ohio-164, ¶ 18; *Yoder v. Hurst*, 10th Dist. No. 07AP-121, 2007-Ohio-4861, ¶ 20-25 (discussing the use of expert testimony as to the reasonableness of attorney fees in a contract dispute).

{¶ 42} For these reasons, we conclude the trial court erred in granting appellees' motion for directed verdict on the issue of damages related to the Belmont County litigation. We sustain appellants' first assignment of error.

## V. Remaining Assignments of Error

{¶ 43} While our resolution of appellants' first assignment of error requires reversal, we are compelled to address some of the issues presented in the remaining assignments of error in the event these same issues present themselves on remand. In their second assignment of error, appellants argue the trial court erred in eliminating the jury's award of punitive damages under R.C. 2315.21(D)(2)(b) on the grounds that appellees had no net worth during the period when the injury occurred. In their third and final

assignment of error, appellants argue the trial court erred in determining the amount of attorney fees, costs, and expenses it could recover. Finally, in their second assignment of error, appellees argue the trial court erred in denying their motion for directed verdict and their motion for judgment notwithstanding the verdict with respect to the award of punitive damages. We address each of these issues in turn.

### A. Appellees' Motion for Directed Verdict or Judgment Notwithstanding the Verdict on Punitive Damages

{¶ 44} Appellees argue the trial court erred in denying their motion for directed verdict and motion for judgment notwithstanding the verdict with respect to punitive damages. As noted above, a motion for directed verdict tests the sufficiency of the evidence. *Reeves* at ¶ 37. The same standard applies to a motion for judgment notwithstanding the verdict. *Miller v. Lindsay-Green, Inc.*, 10th Dist. No. 04AP-848, 2005-Ohio-6366, ¶ 52. Though appellees challenge the jury's finding of malice and/or bad faith necessary to impose punitive damages, we note that appellees arguments in this regard represent arguments about the weight and credibility of the evidence. Such considerations are not appropriate upon consideration of a motion for directed verdict or a motion for judgment notwithstanding the verdict.

### B. Elimination of the Punitive Damages Award

{¶ 45} Appellants argue the trial court erred in reducing the jury's punitive damage award from $200,000.00 to $0.00 under R.C. 2315.21(D)(2)(b) on the grounds that appellees had no net worth during the period when the injury occurred.

{¶ 46} R.C. 2315.21(D)(2)(b) provides:

> If the defendant is a small employer or individual, the court shall not enter judgment for punitive or exemplary damages in excess of the lesser of two times the amount of the compensatory damages awarded to the plaintiff from the defendant or ten percent of the employer's or individual's net worth when the tort was committed up to a maximum of three hundred fifty thousand dollars, as determined pursuant to division (B)(2) or (3) of this section.

Though a plaintiff bears the burden of proof to demonstrate entitlement to punitive damages, a plaintiff has no burden to provide evidence of the defendant's financial circumstances in order to recover punitive damages. *Bigler v. Personal Serv. Ins. Co.*, 7th

Dist. No. 12 BE 10, 2014-Ohio-1467, ¶ 165, citing *Wagner v. McDaniels*, 9 Ohio St.3d 184, 186-87 (1984). Instead, the party seeking a reduction under R.C. 2315.21(D)(2)(b) to avoid punitive damages bears the burden of proving its financial situation was a relevant factor in a lesser punitive damage award. *Moore v. Schill*, 8th Dist. No. 107049, 2019-Ohio-349, ¶ 18, citing *Bigler* at ¶ 165, citing *Wagner* at 186-87.

{¶ 47} R.C. 2315.21(D)(2)(b) does not define "net worth," nor does it otherwise direct a court how to determine net worth when considering punitive damage limitations. The statute does direct that the relevant inquiry is the defendant's net worth when the tort was committed. Here, the allegations against appellees related to their representation of the Balcars in 2010 and 2011, but the allegations also included Jarvis' continued refusal to cooperate in the Belmont County litigation in 2012. In reviewing the record, we note the trial court reduced the punitive damages award to zero based on Jarvis' brief testimony that his personal net worth was "negative" in 2010 and 2011 due to student loan debt and obligations to pay child support and spousal support; the record contains no evidence regarding Jarvis' personal financial situation in 2012. On cross-examination, Jarvis provided estimates of the amount of money his law firm grossed from 2017 to 2019, but appellees never provided any evidence of the firm's valuation from 2010 to 2012 despite the law firm also being a named defendant. Jarvis also retreated from his statement on direct examination that he had a negative net worth, instead stating he "didn't have a lot" in 2010. (Tr. Vol. IX at 2081.) It is appellees' burden to prove their net worth at the time of the tort, and a consideration of net worth likely involves more than a blanket statement that an individual did not have much money, especially when the named defendants include both an individual and a law firm.

### C. Motion for Attorney Fees

{¶ 48} Appellants additionally argue the trial court erred in determining the amount of attorney fees it would award. Appellants sought attorney fees in the amount of $318,822.12 but the trial court granted only $129,353.44. The trial court's stated reasoning for the large reduction was counsel's use of "block-billing," the practice of combining multiple tasks into a single time entry. The trial court stated it could not consider "block-billed" entries when considering whether requested attorney fees are reasonable and

necessary based on the Supreme Court of Ohio's decision in *State ex rel. Harris v. Rubino*, 156 Ohio St.3d 296, 2018-Ohio-5109.

{¶ 49} In *Rubino*, the Supreme Court discussed the difficulty of assessing whether fees are reasonable and necessary when presented with a block-billed time entry and stated:

> We take this opportunity to clarify that this court will no longer grant attorney-fee applications that include block-billed time entries. Future fee applications submitted to this court should contain separate time entries for each task, with the time expended on each task denoted in tenths of an hour. Applications failing to meet these criteria risk denial in full.

*Rubino* at ¶ 7. Though the Supreme Court stressed in *Rubino* that block-billing is not the best practice going forward, we do not agree with the trial court that *Rubino* prohibited, as a matter of law, the trial court from even considering the block-billed entries. The guidance in *Rubino* is that applications for attorney fees contain separate time entries for each task with the time spent on each task specifically denoted. Here, appellants' counsel testified at length during the attorney fee hearing to explain each purported example of block-billing, with the testimony spanning more than 230 pages of the transcript. *Rubino* would not operate to bar the trial court from considering this testimony to clarify the services rendered in the block-billed entries and then considering whether those fees were reasonable and necessary. *See Christen v. Continental Ents., Ltd.*, 8th Dist. No. 108736, 2020-Ohio-3665, ¶ 47 (finding no abuse of discretion in trial court's granting attorney fees despite use of block billing because, even in light of *Rubino*, the relevant consideration is whether the court can determine whether the time spent in pursuant of the claim was reasonable).

## VI. Disposition

{¶ 50} Based on the foregoing reasons, the trial court did not err in denying appellees' motion to dismiss. However, the trial court erred in granting appellees' motion for directed verdict with respect to damages in the form of legal fees associated with the Belmont County litigation. Having overruled appellees' first assignment of error but having sustained appellants' first assignment of error, rendering moot appellants' second and third assignments of error and appellees' second assignment of error, we affirm in part and

reverse in part the judgment of the Franklin County Court of Common Pleas and remand this matter for further proceedings consistent with this decision.

*Judgment affirmed in part and reversed in part;*
*cause remanded.*

DORRIAN, P.J., and HESS, J., concur.

HESS, J., of the Fourth Appellate District, sitting by assignment in the Tenth Appellate District.

—————————————